Clifford O. BOREN, Delta M. Boren and
Clifford O. Boren Contracting Co.,
Inc., Appellants,

v.

Lloyd M. TUCKER, Special Agent, Internal Revenue Service, Appellee.

No. 15010.

United States Court of Appeals
Ninth Circuit.

Dec. 3, 1956.

Rehearing Denied Jan. 8, 1957.

John A. Brant, San Diego, Cal., for appellants.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Attorney, Dept. of Justice, Washington, D. C., Laughlin E. Waters, U. S. Atty., Edward R. McHale, Asst. U. S. Atty., Chief, Tax Division, Thomas J. Sullivan, Attorney, Int. Rev. Service, Los Angeles, Cal., for appellee.

Before LEMMON, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

Appeal is here taken from the judgment of the District Court adjudging the appellants Clifford O. Boren, as President, and Delta M. Boren, as Vice-President, of Clifford O. Boren Contracting Company, Inc., and the corporation, itself, and each of them, in civil contempt, and committing the two individuals to the custody of the United States Marshal until they comply with the orders of court requiring them *"to produce for examination, copying, photostating or photographing"* certain documents; to-wit: General Journal, Cash Journal, General Ledger, Payroll Records and Payroll Checks bearing the endorsement of any of the following named persons:

Clifford O. Boren
Delta M. Boren
Marjorie H. Bell
Betty K. McCarthy

and the Clifford O. Boren Contracting Company, Inc., for the period from July 1, 1951 to December 31st, 1951.

The cause arose upon a petition of a Special Agent of the Internal Revenue Service seeking to enforce an administrative subpoena, 26 U.S.C.A. § 7604,[1] issued in an investigation of the internal revenue tax liability of Clifford O.

1. "Enforcement of summons. (a) Jurisdiction of district court.—If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data.

"(b) Enforcement.—Whenever any person summoned under section 7602 neglects or refuses to obey such summons, or to produce books, papers, records, or other data, or to give testimony, as required, the Secretary or his delegate may apply to the judge of the district court or to a United States commissioner for the district within which the person so summoned resides or is found for an attachment against him as for a contempt. It shall be the duty of the judge or commissioner to hear the application, and, if satisfactory proof is made, to issue an attachment, directed to some proper officer, for the arrest of such person, and upon his being brought before him to proceed to a hearing of the case; and upon such hearing the judge or the United States commissioner shall have power to make such order as he shall deem proper, not inconsistent with the law for the punishment of contempts, to enforce obedience to the re-

Boren and Delta M. Boren for the years 1950 and 1951.[2]

When the appellants refused to comply with the subpoena, the instant petition was filed, and three orders were issued, (two by Judge Harry C. Westover on September 19th, 1955, addressed to the individual defendants as officers of the corporation, and one by Judge Leon R. Yankwich on September 30, 1955, addressed to Clifford O. Boren, as President of the then respondent corporation) ordering appellants to show cause why they should not be punished for contempt. They refused to produce the documents, and a hearing was had on December 5th, 1955, before Judge Wm. C. Mathes. His order was the basis for the subsequent contempt found by the court.

To the petition, the respondents below (appellants here) filed an answer, generally denying the material allegations, and setting up nine separate defenses.[3] Appellants also filed a motion to vacate the order to show cause.

Two proceedings were had in the lower court on December 5th, 1955. The court's minutes show that the first was the hearing of the motion of appellants to vacate the order to show cause, and the second, the hearing of the order to show cause itself. The first motion was granted in part, (that part relating to an immediate attachment of the person) and the balance denied.

On the hearing of the order to show cause, both parties introduced evidence, written and oral, pursuant to stipula-tions. [Tr. 104] The second and ninth defenses were stricken on motion of petitioner. The remaining separate defenses were not sustained. The petition was granted, *in part;* i. e.,

"to the extent that respondents are ordered to appear and give testimony in response thereto and produce the documents set forth in the summonses, Exhibits A, B and C, to the petition." [Tr. 46]

Findings of Fact and Conclusions of Law, and the order requiring production were prepared, signed, and filed. [Tr. 48]

The appellants thereafter, having appeared with the records on the return day, December 8th, 1955, but having refused to comply with the court's order to produce, were held in contempt on December 13th, 1955. Appellants then filed a cash deposit in lieu of a supersedeas bond, and Notice of Appeal, and obtained a supersedeas order, staying execution and impounding the documents specified in the summonses with the Clerk of the Court, where they now are.

In this matter we might well have followed the example of the Fifth Circuit earlier this year, in Globe Construction Co. v. Humphrey, 229 F.2d 148, and by per curiam decision point out (a) that the Government felt the allegations in the affidavit of the officer who issued the subpoena were sufficient to support its issuance; (b) that the lower court made an order enforcing it; and (c) that we agree with both the officer and the lower court; that

---

quirements of the summons and to punish such person for his default or disobedience."

**2.** Another aspect of this same investigation has recently been before this court. Hubner v. Tucker, 9 Cir., —— F.2d ——.

**3.** These were: *First:*—That one examination of the records sought had already been made of the 1950 and 1951 papers, between November 2, 1953, and September 8, 1954; *Second:*—That the Government had no right to start from "scratch" on October 20th, 1954; altho they had examined the papers between October 18th, 1954, and July 15th, 1955;

*Third:*—That the tax for 1950 and 1951 had already been determined and a deficiency noted; *Fourth:*—That the Government failed to utilize prior opportunity; *Fifth:*—That the examination seeks Information for Criminal, not Civil prosecution; *Sixth:*—That there was no notice in writing of an Additional Inspection; *Seventh:*—That petitioner lacks authority; *Eighth:*—That the records sought, for the period July 1, 1951 to December 31, 1951, were not material to a determination of the liability for the year 1950; *Ninth:*—That there was no probable cause.

"we think: that the insistence of the appellant to the contrary proceeds from a misconception of the nature of the subpoena power at issue here and of the conditions requisite to its exercise."

The action of the District Judge in ordering the subpoena enforced, the same per curiam decision holds, "was right. His order is affirmed."

Or we might have followed the 1954 per curiam decision of the Sixth Circuit, Peoples Deposit Bank & Trust Co. v. United States, 212 F.2d 86, at page 87. There the court concluded the special agent was not required to disclose in detail the facts relative to his investigation and his conclusion.

"that there was strong suspicion of a false or fraudulent tax return [by a taxpayer] for a certain year or years prior to the statutory limitation * * * nor was the District Court obliged to require proof of facts showing reasonable grounds to believe that the tax returns of [taxpayer] and others were false or fraudulent."

There "Judgment was affirmed, * * * for the reasons stated in the opinion below."

But we are certain such a disposition of this matter would not satisfy counsel for appellants herein.

The questions presented on this appeal, according to appellants' earnest contentions, are seven in number. Respondent reduces the issues involved to three. Because we believe the order of the lower court should be affirmed, we will follow the appellants' description of the points involved, and discuss each of them. They are:

1. Should appellants' second defense to the petition have been stricken, i. e., is it a proper separate defense to allege that because of one examination by the Government, a reexamination was unnecessary and unreasonable?

2. Were the provisions of § 7605 (b), I.R.C.1954 [26 U.S.C.A. § 7605(b)], (particularly the requirement of written notice to taxpayer before a re-examination) followed?

3. Does an "examination" include the right to photostat taxpayer's records?

4. Does the law authorizing an examination for the "correctness" of a taxpayer's return permit the Government to seek evidence for his criminal prosecution?

5. Has the Government sustained the burden of proof that the books and records sought are material and relevant?

6. Was there a sufficient showing of investigation of fraud to avoid the bar of the statute of limitations?

7. Did the order to show cause state a claim upon which appellants could be held in civil contempt?

The able trial court carefully went into the unusual factual situation existing in this case, and carefully made findings, including separate findings as to each valid separate defense. Not the least of these peculiar circumstances brought to his attention was the existence of serious charges made against a Government employee once assigned to the investigation of appellants' taxes; the employee's resignation from Government service; and the ascertainment, by the Government, for the first time in March, 1955, of the possibility of the existence of fraudulent payroll records; that is to say, some indication that an alleged employee of the corporation during a part of 1951 was not such an employee, and did not receive the wages shown on the corporate records as having been paid her. [Employee's affidavit, dated March 15, 1955; Tr. 132; Findings, IX and X.] To take up appellants' points of alleged error in order:

I. On the showing before the District Court at the time of the hearing, the judge found that Special Agent Tucker's examination of tax liability of Clifford O. and Delta M. Boren com-

menced in November 1953, and "never terminated, and is still continuing." [Findings, XXIII.] Technically then, there is no question before this court of any "re-examination" made by the Government of the taxpayer's records, unless there is no sufficient support for the court's Findings of Fact on this issue. It is our opinion that the court's findings are amply supported by the record. But were we confronted with the question as to whether a re-examination of the subpoenaed records was proper in this case, we would not hesitate to hold, under the facts presently developed, that the Government would be entitled to a re-examination, *provided* always, that the Government's representatives complied with the law in requesting and obtaining such re-examination. Martin v. Chandis Securities Co., 9 Cir., 1942, 128 F.2d 731.

■ The burden was on the Government, had it desired a re-examination, to show that its request was in accordance with the law. It was therefore unnecessary for appellants here (respondents below) to plead as a special defense that the Government must proceed in accordance with statutory law.

The purported second and separate defense was properly stricken, and there was no error in appellants' first specification.

II. Because of the court's specific and precise findings that the examination had never terminated, there was no "re-examination". Appellants' second specification of error therefor becomes immaterial.

■ III. The right to photostat. We think it obvious that when the factual question involved in a trial is whether the person named as payee on a payroll check or checks, actually endorsed it or them, or whether someone else signed or forged his name, that a photostatic copy of the purported signature must be obtained, blown up, and pored over by handwriting experts before any safe conclusion can be arrived at. Copies of a check are not sufficient. Copies are inferior in any instance to adequate photostatic copies. An exact copy, and only an *exact* copy, can permit the experts to determine the existence or non-existence of tracings, erasures, flow of letters, angles of letters, duplications of writings, joinings, effect of ink exposures, and all the hundred and one factors that make the handwriting expert an expert; and the study and interpretation of handwriting a science.

Law suits and the preparation therefor, as well as investigations which may show them unnecessary, are not to be considered games. They are part of the eternal search for truth. The courts should aid the ascertainment thereof, and not set up artificial barriers or technical academic rules that prevent it. A mere recital of the value of photostatic copies over ordinary copies should require the inclusion of such a right to make photostats available to either party to any serious dispute, which is part of the quest for the true facts.

The only case cited by appellants, United States v. Kraus, D.C., 270 F. 578, is not in point. There was involved the suppression of evidence illegally seized, and the refusal to suppress evidence lawfully obtained; the question in each instance, one of illegal search and seizure. Of course, if the Government had illegally searched and seized taxpayer's records here, it would have no right to photostat them, or use them in any way. Such a fact and situation does not here exist, nor is even claimed. See, Westside Ford, Inc., v. United States, 9 Cir., 206 F.2d 627, 634, where a similar Office of Price Stabilization statute was under consideration, and the court stated:

"We are not impressed with the argument. The construction urged by appellant would mean that investigators may look at documents but may not record what they see; that they must commit to memory hundreds of documents, with long columns of figures, to determine complex questions whether the regulations have been violated or evaded. This reductio ad absurdum is a suf-

ficient answer to appellant's argument. Rightly construed § 2155(a) gives the President or his appointees discretion as to the means of investigation as well as the subjects of investigation."

■ IV. Section 7602 authorizes the examination of taxpayer's records to determine "correctness" of an income tax return. Does this prevent examination for purpose of securing evidence for a criminal prosecution?

Obviously, if there be fraud established, a taxpayer faces a possible 50% addition in the amount he must pay as taxes, or a possible criminal prosecution, or both. Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917. Hanby v. C. I. R., 4 Cir., 67 F.2d 125. If there be fraud, his tax return is not "correct" until the matter of penalties has been disposed of.

It should be noted that the statute under consideration, by its language, does not limit the examination it authorizes solely to the issue of correctness. Section 7602 [4] authorizes an examination for the purpose of "ascertaining the correctness," "determining the liability of any person for any internal revenue tax," (emphasis added) "or collecting any such liability." If a fraudulent tax return changes a taxpayer's liability, how could that fact be established without someone being required to come to a conclusion as to a possible criminal prosecution? Once an error has been established, it seems necessary for the examiner to come to some conclusion, one way or the other, as to whether there existed the possibility of criminal prosecution in the future. If no possibility exists, then one rule to determine liability comes into play—i. e., what tax should have been paid when the tax is correctly determined. If a possible criminal prosecution exists, then there is a possibility of another rule being used, the 50% penalty, to determine the correct tax. While it is true that once a possible criminal prosecution comes into

existence there can be no settlement of tax until that possibility has been ruled out, yet the existence of the possibility of criminal prosecution does not necessarily mean that there will be criminal prosecution. The ultimate decision may be, (1) civil liability for the correct tax, (2) liability for the tax plus penalty, (3) criminal prosecution, or (4) both the penalty and the criminal prosecution. Helvering v. Mitchell, supra; 26 U.S. C.A. § 6653(b), 7201 et seq.

In truth, we presume the "Secretary or his delegate" would be unfaithful to his statutory responsibilities if in every examination, once an incorrect return has been demonstrated or established, he did not come to some preliminary conclusion as to whether there existed facts sufficient upon which to base a possible criminal prosecution, without coming to any conclusion as to whether there should be a criminal prosecution.

Appellant cites as his only authority on this aspect of his position—United States v. O'Connor, D.C.Mass.1953, 118 F.Supp. 248, 250.

There the learned trial judge held that the then existing statute, (similar to present § 7602) [5] authorizing agents of the Bureau of Internal Revenue to subpoena documents pertinent to a taxpayer's liability, did not authorize an agent to issue a subpoena, merely to aid the prosecution of a pending criminal action by the Department of Justice.

The facts in the O'Connor case were vastly different from those here present. To list a few:

1. The taxpayer there was under indictment.

2. The Special Agent there, who had the subpoena issued, had at that time finished his investigation, and "completed his report".

3. The Special Agent then had no matter concerning the taxpayer pending before him.

4. The Department of Justice, (not directly, but indirectly) had "suggested" that the Administrative

4. Section 7602, Internal Revenue Code of 1954, 26 U.S.C.A. § 7602.

5. 26 U.S.C.A. § 3614.

subpoena be used by the Special Agent to aid the Government in the preparation of the pending criminal case. The Special Agent admitted that in issuing the subpoena, *"at least one* of his purposes was to aid the Department of Justice in the prosecution of the criminal case".

5. The Special Agent, in requesting the subpoena, was in no way performing *his* duties, nor following the orders of any superior in the Internal Revenue Bureau.

The Government argued in the O'Connor case that the facts before the court showed that while "at least one" of the purposes of the Special Agent was to aid the criminal prosecution of the taxpayer, this statement raised the *inference* that there existed other purposes, and that these other purposes might possibly be of direct interest to the Treasury and its Special Agent. The court, (and we think properly so in view of the factual situation there existing) refused to consider any undisclosed purposes arising from inference, and held it to be against public policy for the Judicial branch of the Government to lend its support to the use of an *unrestricted* administrative subpoena power.

None of the five facts hereinabove mentioned existed in the instant case, when the subpoena was sought. The O'Connor case simply does not support appellants' position.

█ Special Agent Tucker made a showing that satisfied the lower court that fraud was properly an issue in the enquiry.[6] He satisfies us as well. We cannot see how the trier of fact could have come to any other conclusion but that reasonable grounds existed for an enquiry by the Government into the matter of possible fraud.[7]

█ V. Has the Government sustained its burden of proof as to materiality and relevance?

The unreported case cited by appellant supports his position that the burden is on the Special Agent "to show that the demand is reasonable under all the circumstances, and to prove that the records demanded are relevant and material to the tax liability of the person liable to the tax". Local 174, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America and Nugent LaPoma v. United States, 9 Cir., 240 F.2d 387.

The facts mentioned earlier in this opinion establish the materiality and the relevancy of the evidence sought. The court held a careful hearing. The court's findings indicate his belief in the materiality and relevancy of the evidence sought. [Findings, IX, X, XXV.] The court specifically found the evidence sought by petitioner was material and relevant. [Findings, XXVI; Conclusion of Law, II.]

This clearly establishes that the Government has sustained its burden of proof.

VI. Was there a sufficient showing of fraud to toll the statute of limitations?

The petitioner obviously did not, and could not, allege fraud. He alleged that it was necessary for him to continue his investigation; and he proved by his testimony that the reason it was necessary was that there existed the *possibility* of fraud, depending on the factual issue of the "validity of endorsements on those checks, and whether there have been forgeries of those checks." [Tr. 130] Once the probability of forgery can be determined, the possibility of fraud can be determined; and the Government can then decide if fraud can, or should, be alleged and relied upon.

The test of Martin v. Chandis Securities Co., 9 Cir., supra, is satisfied. Any issue of proof of actual fraud must of necessity await trial; and may never ultimately be alleged. This will depend on many factors not presently before this court; nor before the lower court.

6. Findings of Fact, VI, VII, X, XXI, XXV; Conclusions of Law IV, V.

7. Pet.Ex. 1; Tr. 3, 8; Testimony of Lloyd M. Tucker, Tr. 116, et seq.; Testimony of Forrest P. Calkins, Tr. 143, et seq.

Appellant seeks to rely entirely on appellee's affidavits, filed below, and disregards entirely the testimony of the Special Agent's at the hearing of the order to show cause:

"The Court: Well, I understood that the witness admitted that he was conducting [the investigation] for purposes of investigating possible criminal prosecution."

"Mr. Brant: (for appellants) That is correct." [Tr. 124]

[See also Tr. 117 et seq.; and Conclusion of Law, IV-Tr. 61.] There was a sufficient showing of the possibility of fraud to permit the enquiry into the matter, and to require the production of the records sought. Globe Construction v. Humphrey, supra; Peoples Deposit Bank & Trust Co. v. United States, supra.

VII. Finally, we come to appellants' last point, that because the proceeding in the District Court below was an order to show cause based on a refusal to comply with an administrative subpoena and summons, no claim was stated upon which a person could be held in civil contempt.

It is difficult to follow appellants' reasoning on this point. The procedures which he advocates and to which he claims his clients are entitled, were followed. Appellants were held in contempt of the District Court by Judge Wm. C. Mathes, on December 13th, 1955, at 2:00 P.M., [Tr. 76, et seq.] for their refusal to obey an order of the court previously made on December 13th, 1955, after a hearing at 10:00 A.M. on said day. [Tr. 74] This hearing established that appellants had appeared on December 8th, 1955, before the petitioner below, but at that time had refused to produce the records required by the court's order theretofore made by Judge Wm. C. Mathes on December 7th, 1955, [Tr. 63], subsequent to the entry of the Findings of Fact, and Conclusions of Law dated December 7th, 1955, signed by said Judge Wm. C. Mathes, [Tr. 48 to 62, incl.] he having heard on December 5th, 1955, the following matters: (1) the Motion of respondent filed October 5, 1955, to vacate the order to show cause, [Tr. 15] and (2) the order to show cause, filed September 30th, 1955. [Tr. 14, 15]

This record shows that appellants have exercised thoroughly and at considerable length the right given them to contest the validity of administrative subpoenas. Section 7604(b), I.R.C. This right has been exercised in the proper court, Section 7604(a), I.R.C. This was done prior to the imposition of any form of penalty for non-compliance with the court's order.

The Judgment and Order of the District Court committing Clifford and Delta Boren, officers of the Clifford O. Boren Contracting Company, Inc., a corporation, to the custody of the United States Marshal until they shall obey the Order of the District Court compelling them to produce for examination, copying and photostating the summoned corporate books, records and payroll checks, and fining the corporation $110.00, is

Affirmed.